Nos. 22-1819(L) & 22-1822

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

CITY OF HUNTINGTON, WEST VIRGINIA and
CABELL COUNTY COMMISSION,

*Plaintiffs-Appellants*,

v.

AMERISOURCEBERGEN DRUG CORPORATION, *et al.*,

*Defendants-Appellees*.

On Appeals from the United States District Court
for the Southern District of West Virginia
Case Nos. 3:17-cv-01362 and 3:17-cv-01665, Hon. David A. Faber

REPLY BRIEF FOR APPELLANTS

Louis M. Bograd
Michael J. Quirk
MOTLEY RICE LLC
401 Ninth Street, N.W., Suite 1001
Washington, D.C. 20004
(202) 386-9623
lbograd@motleyrice.com
mquirk@motleyrice.com
*Counsel for Plaintiff-Appellant*
*City of Huntington, West Virginia*

David C. Frederick
Ariela M. Migdal
Lillian V. Smith
Matthew N. Drecun
Kathleen W. Hickey*
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dfrederick@kelloghansen.com
amigdal@kelloghansen.com
lsmith@kelloghansen.com
mdrecun@kelloghansen.com
khickey@kelloghansen.com
* Admitted only in Massachusetts;
supervised by members of the firm
*Counsel for Plaintiffs-Appellants*

May 1, 2023

*(Additional Counsel Listed On Inside Cover)*

Anthony J. Majestro
Christina L. Smith
POWELL & MAJESTRO, PLLC
405 Capitol Street, Suite P-1200
Charleston, West Virginia 25331
(304) 346-2889
amajestro@powellmajestro.com
csmith@powellmajestro.com
*Counsel for Plaintiff-Appellant*
*Cabell County Commission*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION .............................................................................. 1

ARGUMENT .................................................................................... 3

I.    THE DISTRICT COURT ERRED IN HOLDING THAT
WEST VIRGINIA PUBLIC NUISANCE LAW DOES
NOT APPLY TO THE DISTRIBUTION OF OPIOIDS .............................. 3

    A.    West Virginia Permits Public Nuisance Claims
Concerning Opioids ............................................................ 4

    B.    Appellees' "Products"-Based Limitation Lacks Support
In West Virginia Law ......................................................... 6

        1.    Appellees mischaracterize the WVSCA's public
nuisance cases and Appellants' claims ...................... 7

        2.    Appellees ignore West Virginia opioid cases,
relying on out-of-state outlier cases and an
inapplicable treatise provision .................................. 8

        3.    The opioid crisis devastated public resources .......... 11

        4.    Appellees' policy arguments fail ............................. 12

II.    APPELLEES UNREASONABLY INTERFERED WITH
PUBLIC RIGHTS BY VIOLATING THE CSA ....................................... 13

    A.    The District Court And Appellees Misinterpret The CSA ................. 14

        1.    The court departed from settled law .......................... 14

        2.    Appellees' denial of the duty to investigate suspicious
orders fails ............................................................. 15

    B.    The District Court Misapplied The CSA ............................ 18

    C.    Appellees' Other Defenses Of The District Court's Findings
Lack Merit ...................................................................... 20

1.    Appellees failed to conduct adequate due diligence ................ 20

2.    Appellees enabled egregious overprescribing ......................... 22

3.    DEA criticized, not endorsed, Appellees .................................. 23

4.    Rejecting Rafalski was erroneous but not dispositive ............. 25

5.    Changing medical standards do not excuse Appellees' CSA violations .......................................................................... 26

D.    The District Court Analyzed Reasonableness Erroneously ............... 28

III.   THE DISTRICT COURT ERRED IN HOLDING THAT APPELLANTS DID NOT ESTABLISH PROXIMATE CAUSE ................................................................................................. 29

A.    Appellees Proximately Caused The Opioid Epidemic In Cabell/Huntington ....................................................................... 30

B.    Appellees' Causation Arguments Fail ................................................. 32

1.    Appellees' "remoteness" arguments have no basis in West Virginia law ................................................................. 33

2.    Appellees misstate Appellants' causation arguments and rely on inapposite cases ......................................... 34

IV.   THE DISTRICT COURT ERRED IN HOLDING THAT THE REQUESTED ABATEMENT REMEDY IS UNAVAILABLE ................. 36

A.    Abatement May Require A Defendant To Address Harmful Conditions It Created ........................................................... 36

B.    Payment Of Money Does Not Convert Abatement Into Damages ............................................................................................. 39

C.    Appellees' Remaining Arguments Fail ................................................ 40

CONCLUSION ................................................................................................. 41

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ii

# TABLE OF AUTHORITIES

Page(s)

## CASES

### Federal

*City & Cnty. of San Francisco v. Purdue Pharma L.P.*:

 491 F. Supp. 3d 610 (N.D. Cal. 2020)............................................26

 --- F. Supp. 3d ---, 2022 WL 3224463
 (N.D. Cal. Aug. 10, 2022) ............................................................10

*City of Charleston v. Joint Comm'n*, 473 F. Supp. 3d 596
 (S.D.W.Va. 2020) .....................................................................34, 35

*Direct Sales Co. v. United States*, 319 U.S. 703 (1943) ..............16, 17, 31

*Employer Teamsters-Local Nos. 175/505 Health & Welfare Tr. Fund
 v. Bristol Myers Squibb Co.*, 969 F. Supp. 2d 463 (S.D.W.Va.
 2013) ...............................................................................................35

*Environmental Def. Fund, Inc. v. Lamphier*, 714 F.2d 331 (4th Cir. 1983)............41

*Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1939).....................................2, 9

*Ferens v. John Deere Co.*, 494 U.S. 516 (1990).........................................5

*Gibson v. Schultz*, 1990 WL 194522 (4th Cir. Dec. 10, 1990)................24

*Guaranty Tr. Co. v. York*, 326 U.S. 99 (1945).........................................41

*Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844 (1982)...................18

*Johnson v. Hugo's Skateway*, 974 F.2d 1408 (4th Cir. 1992) .................24

*Masters Pharm., Inc. v. DEA*, 861 F.3d 206 (D.C. Cir. 2017) .................14, 15, 16,
                17, 18, 20, 21, 25

*Moore v. Equitrans, L.P.*, 27 F.4th 211 (4th Cir. 2022) ...........................6

*National Prescription Opiate Litig.*, *In re*:

    2018 WL 6628898 (N.D. Ohio Dec. 19, 2018)................................................34

    2019 WL 3917575 (N.D. Ohio Aug. 19, 2019)
    ("*MDL CSA Ruling*")................................................................................14, 16

    2019 WL 4178617 (N.D. Ohio Sept. 3, 2019)................................................31

*Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88 (4th Cir. 2011) ............6, 10

*Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455 (4th Cir. 1996) ......................18

*Shafer v. United States*, 229 F.2d 124 (4th Cir. 1956)..........................................41

*Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87 (1995) .........................................18

*Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020) .........................41

*SSMC, Inc., N.V. v. Steffen*, 102 F.3d 704 (4th Cir. 1996) ....................................41

*Thorpe v. Clarke*, 37 F.4th 926 (4th Cir. 2022) ....................................................19

*Vulcan Materials Co. v. Massiah*, 645 F.3d 249 (4th Cir. 2011) ...........................22

*Welch v. Chao*, 536 F.3d 269 (4th Cir. 2008)........................................................18

*Wells v. Liddy*, 186 F.3d 505 (4th Cir. 1999).........................................................5


**State (other than West Virginia)**

*California v. ConAgra Grocery Prods. Co.*, 227 Cal. Rptr. 3d 499
    (Cal. Ct. App. 2017) .....................................................................................9

*People v. Purdue Pharma L.P.*, 2021 WL 7186146 (Cal. Super. Ct.
    Dec. 14, 2021).............................................................................................27


**West Virginia**

*Board of Comm'rs of Ohio Cnty. v. Elm Grove Mining Co.*,
    9 S.E.2d 813 (W.Va. 1940) ....................................................................4, 13

*Brooke Cnty. Comm'n v. Purdue Pharma L.P.*, 2018 WL 11242293
(W.Va. Cir. Ct. Dec. 28, 2018), *writ denied*, No. 19-0210
(W.Va. June 4, 2019)..............................................................5, 32, 34

*Burch v. Nedpower Mount Storm, LLC*, 647 S.E.2d 879 (W.Va. 2007) ................39

*Duff v. Morgantown Energy Assocs.*, 421 S.E.2d 253 (W.Va. 1992) .......4, 27, 28, 29

*Evans v. Farmer*, 133 S.E.2d 710 (W.Va. 1963)......................................................29

*Hark v. Mountain Fork Lumber Co.*, 34 S.E.2d 348 (W.Va. 1945).................27, 36

*Humphrey v. Westchester Ltd. P'ship*, 2019 WL 2185972
(W.Va. May 21, 2019)....................................................................33

*Mahoney v. Walter*, 205 S.E.2d 692 (W.Va. 1974)..................................................8

*Martin v. Williams*, 93 S.E.2d 835 (W.Va. 1956) .........................................8, 37, 38

*Metro v. Smith*, 124 S.E.2d 460 (W.Va. 1962)........................................................33

*Opioid Litig.*, *In re*:

Order Denying Defs.' MSJ re "Factual Issue #2,"
Civil Action No. 21-C-9000 DISTRIBUTOR
(W.Va. M.L.P. July 1, 2022) ("*MLP SJ Opinion*")...........................................5

Order Denying Pharmacy Defs.' Mots. To Dismiss, Civil
Action No. 21-C-9000-PHARM (W.Va. M.L.P. Aug. 3, 2022)
("*MLP Pharm MTD Order*"), *writ denied*, No. 22-635 (W.Va.
Sept. 8, 2022) ..............................................................................11

*Pope v. Edward M. Rude Carrier Corp.*, 75 S.E.2d 584 (W.Va. 1953).................29

*Sergent v. City of Charleston*, 549 S.E.2d 311 (W.Va. 2001)..................................32

*Sharon Steel Corp. v. City of Fairmont*, 334 S.E.2d 616
(W.Va. 1985) .................................................................................3, 4, 7, 8

*State ex rel. AmerisourceBergen Drug Corp. v. Moats*,
859 S.E.2d 374 (W.Va. 2021) .......................................................40

*State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719 (Okla. 2021).............9, 10

*State ex rel. Miller v. Stone*, 607 S.E.2d 485 (W.Va. 2004).....................................8

*State ex rel. Morrisey v. AmerisourceBergen Drug Corp.*,
   2014 WL 12814021 (W.Va. Cir. Ct. Dec. 12, 2014),
   *writ denied*, No. 15-1026 (W.Va. Jan. 5, 2016) ...............................................5

*State ex rel. Smith v. Kermit Lumber Co.*, 488 S.E.2d 901
   (W.Va. 1997) ................................................... 3, 4, 7, 12, 13, 37, 38

*Taylor v. Culloden Pub. Serv. Dist.*, 591 S.E.2d 197 (W.Va. 2003) ......................13

*Webb v. Sessler*, 63 S.E.2d 65 (W.Va. 1950) ...........................................33

*West v. National Mines Corp.*, 285 S.E.2d 670 (W.Va. 1981)....................35, 38, 39

*Wilson v. Phoenix Powder Mfg. Co.*, 21 S.E. 1035 (W.Va. 1895)............................8

*Witteried v. City of Charles Town*, 2018 WL 2175820
   (W.Va. May 11, 2018)...................................................................40

## ADMINISTRATIVE DECISIONS

*Masters Pharm., Inc.*, 80 Fed. Reg. 55,418 (DEA Sept. 15, 2015)...................17, 18

*Southwood Pharms., Inc.*, 72 Fed. Reg. 36,487 (DEA July 3, 2007)..........14, 16, 18

## STATUTES, REGULATIONS, AND RULES

Controlled Substances Act, Pub. L. No. 91-513, tit. II, 84 Stat. 1236,
   1242 (1970), codified as amended at 21 U.S.C. § 801 *et seq.* ............. *passim*

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961
   *et seq.* ...................................................................................................35

West Virginia Uniform Controlled Substances Act,
   W.Va. Code § 60A-1-101 *et seq.* ....................................................... *passim*

21 C.F.R.:

   § 1301.41......................................................................................18

   § 1301.71(a) .................................................................................16

   § 1301.74(b) .................................................................................16

Fed. R. Civ. P. 30(b)(6) ................................................................25

Fed. R. Evid. 408 ..........................................................................24

**OTHER MATERIALS**

Brief for the United States as Amicus Curiae, *In re National*
    *Prescription Opiate Litig.*, Nos. 22-3750 et al., ECF No. 73
    (6th Cir. Mar. 21, 2023) .........................................................16

Restatement (Second) of Torts (1979) ..........................................10, 31

Restatement (Third) of Torts:  Liability for Economic Harm (2020) ...............10, 11

*United States v. AmerisourceBergen Drug Corp.*, No. 2:22-cv-05209
    (E.D. Pa.):

    Compl., ECF No. 1 (Dec. 29, 2022) ............................................15

    Defs.' Mot. To Dismiss, ECF No. 27-1 (Mar. 30, 2023) .............................15

# INTRODUCTION

Appellees distributed massive amounts of prescription opioids in Cabell County and Huntington, West Virginia—far more than any other distributors—while shirking their duties under the Controlled Substances Acts ("CSA") to detect and investigate suspicious orders from Cabell/Huntington pharmacies. Opioids are addictive, lethal drugs, chemically equivalent to heroin. It is predictable that shipping vast volumes of addictive drugs into communities while turning a blind eye to the people buying and using them would harm public health. DEA repeatedly told Appellees so; indeed, the CSA exists to prevent that very problem. The outcome in Cabell/Huntington was the opioid crisis: communities decimated by addiction and overdose.

The district court absolved Appellees of responsibility by upending DEA's and courts' longstanding requirements for controlled-substance distributors. If allowed to stand, its decision would give distributors carte blanche to ignore diversion as someone else's problem. Appellees advance an even more restrictive interpretation of the CSA that would eliminate the duty to investigate suspicious orders altogether. This Court should reaffirm distributors' established duties so that Appellees can be held accountable for violating them.

The Court also should reverse the district court's threshold error of West Virginia law. The court contradicted a line of West Virginia cases allowing governments to bring public nuisance suits like this one, as most courts have

nationwide.  The court misread West Virginia public nuisance cases and relied on scattered outliers from other jurisdictions to reach the opposite result, creating an *Erie* conflict.  Appellees endorse this conflict, arguing public nuisance requires interference with public resources.  Although their legal argument is incorrect, this case manifestly presents such interference.

Appellees cannot justify the court's legal errors, so they bury them in long recitations of the court's fact-findings.  But this Court owes no deference to findings derived under incorrect legal standards.  The court's misinterpretation of the CSA drove its mistaken conclusions that Appellees did not act culpably or proximately cause the nuisance in Cabell/Huntington.  Appellees cannot defend the court's disregard of significant evidence that Appellees violated their CSA duties or the court's failure to assess the reasonableness of their conduct correctly. Under the proper test, Appellees acted unreasonably by violating the CSA over many years.

The court's causation holding also was error.  It held that doctors and other actors were intervening causes of the opioid crisis that broke the causal chain. But West Virginia law required it to consider whether these other causes and Appellees' conduct *concurrently* caused the harm and whether any intervening causes, like criminal activity, were foreseeable.  Appellees compound those failings, claiming West Virginia law has a "remoteness" element, but remoteness

2

is coextensive with core causation inquiries, which Appellees, like the court, fail to undertake.

Finally, like the district court, Appellees suggest imposing arbitrary limits on the nuisance conditions that equitable abatement can address.  They mischaracterize Appellants' remedy as damages, even though the abatement remedy ameliorates harmful conditions in the community, not compensates for personal injuries.

The court severely weakened the CSA and created a conflict with West Virginia courts on public nuisance.  Its errors deprived Cabell/Huntington of the remedy needed to address the ongoing opioid epidemic Appellees caused.  This Court should reverse.

## ARGUMENT

### I.    THE DISTRICT COURT ERRED IN HOLDING THAT WEST VIRGINIA PUBLIC NUISANCE LAW DOES NOT APPLY TO THE DISTRIBUTION OF OPIOIDS

The opioid epidemic in Cabell/Huntington is a public nuisance:  "'an act or condition that unlawfully operates to hurt or inconvenience an indefinite number of persons.'"  *State ex rel. Smith v. Kermit Lumber Co*., 488 S.E.2d 901, 921 (W.Va. 1997) (quoting *Sharon Steel Corp. v. City of Fairmont*, 334 S.E.2d 616, 620 (W.Va. 1985)).  The court erred by barring Cabell/Huntington's claims because, in its view, public nuisance cannot address harms caused by distribution of "products."

Appellees do not deny that an opioid epidemic afflicts Cabell/Huntington. But they repeat the erroneous proposition that the harm to public health, safety, and resources cannot be a public nuisance because it was caused, in part, by the sale of products (opioids). That limitation contradicts West Virginia decisions holding public nuisance applicable to opioid cases like this one. Those decisions reflect the West Virginia Supreme Court of Appeals' ("WVSCA") long emphasis on nuisance law's flexibility, even in cases related to products. Because the outcome in federal diversity cases should be substantially the same as if tried in state court, this Court should decline Appellees' invitation to entrench a split between federal and state courts.

## A.    West Virginia Permits Public Nuisance Claims Concerning Opioids

A public nuisance claim seeks to abate "some harm which affects the public health and safety." *Kermit Lumber*, 488 S.E.2d at 925. It can include harmful conditions arising from lawful business activity. *See Board of Comm'rs of Ohio Cnty. v. Elm Grove Mining Co.*, 9 S.E.2d 813, 817 (W.Va. 1940). What makes the condition a nuisance is its "'reasonableness or unreasonableness'" in "'relation to the particular locality involved.'" *Duff v. Morgantown Energy Assocs.*, 421 S.E.2d 253, 257 (W.Va. 1992) (quoting *Sharon Steel*, 334 S.E.2d at 626).

West Virginia courts have allowed government entities' public nuisance claims concerning opioids, and the WVSCA declined numerous writ petitions to

set aside those rulings.  Appellants' Br. 33-35 ("Br.").  These courts include the

Mass Litigation Panel ("MLP"), a special multi-judge court handling more than 80

governmental opioid cases.  The MLP adopted the view of the trial courts that first

addressed the question and repeatedly has held that "West Virginia public nuisance

law" permits the claims.  Order Denying Defs.' MSJ re "Factual Issue #2" at 2 &

n.1, 6, *In re Opioid Litig*. (W.Va. M.L.P. July 1, 2022) (Add.263, Add.267) (citing

*Brooke Cnty. Comm'n v. Purdue Pharma L.P.*, 2018 WL 11242293 (W.Va. Cir.

Ct. Dec. 28, 2018), *writ denied*, No. 19-0210 (W.Va. June 4, 2019) (Add.217-218);

*State ex rel. Morrisey v. AmerisourceBergen Drug Corp.*, 2014 WL 12814021

(W.Va. Cir. Ct. Dec. 12, 2014), *writ denied*, No. 15-1026 (W.Va. Jan. 5, 2016)).

Federal courts considering the same question "can consider . . . the state's trial

court decisions" in "forecast[ing] a decision of the state's highest court." *Wells

v. Liddy*, 186 F.3d 505, 528 (4th Cir. 1999).

    In rejecting *Brooke County* and *Morrisey* and ignoring the MLP altogether,

the district court determined that identical cases would proceed in state court but

fail in federal court.  That decision violated the rule that "the outcome of the

litigation in the federal court" be "substantially the same, so far as legal rules

determine the outcome of a litigation, as it would be if tried in a State court."

*Ferens v. John Deere Co.*, 494 U.S. 516, 524 (1990).  It also departed from the

weight of nationwide authority permitting public nuisance claims concerning

opioids.  Br. 35-36 & nn.7-8 (collecting opinions from 24 jurisdictions).  It limited

public nuisance claims to those that "interfere[] with public property or resources,"

JA6490, a limitation not found in West Virginia law, while failing to recognize the

opioid epidemic's severe interference with public resources.

Appellees (at 58-59) incorrectly describe the district court as "respond[ing]

**_conservatively_** when asked to discern governing principles of state law," but the

court did the opposite:  it innovated, devising a limitation on public nuisance cases

arising from the sale of products.  Far from adhering to precedent, as Appellees

claim (at 59), the court inappropriately "create[d] . . . public policy" for West

Virginia.  _Moore v. Equitrans, L.P._, 27 F.4th 211, 220 (4th Cir. 2022).  Appellees

(at 59) cite _Rhodes v. E.I. du Pont de Nemours & Co._, 636 F.3d 88 (4th Cir. 2011),

but that case supports Appellants.  _Rhodes_ correctly rejected the plaintiffs' request

to create an exception to the established rule that a private party bringing a public

nuisance claim must have suffered a special injury.  _Id_. at 97-98.  Here, the court

imposed an exception, not adopted by the WVSCA, to the general rule that a

nuisance includes conditions harmful to public health, including those generated

by the sale of lawful products.

### B.  Appellees' "Products"-Based Limitation Lacks Support In West Virginia Law

Appellees acknowledge (at 59) that a public nuisance is an unreasonable

interference with a right common to the general public, but they seek to limit it

6

to conduct interfering with "public property or resources."  The WVSCA has not adopted that limit.  But even if it had, this case involves clear interference with public resources in Cabell/Huntington.  Appellees' defense of the court's ruling misreads WVSCA cases, mischaracterizes Appellants' arguments, and favors minority out-of-state cases and treatise authority not adopted in West Virginia over West Virginia courts and the nationwide majority.

### 1.    Appellees mischaracterize the WVSCA's public nuisance cases and Appellants' claims

Appellees and the district court misread the WVSCA's decisions to conclude that public nuisance requires conduct that "interferes with public property or resources," while excluding any claim relating to sale or distribution of products. JA6490-6491; Appellees' Br. 59-60 ("Resp.").  *Sharon Steel*, on which they both rely, did not adopt those limits and instead emphasized public nuisance's adaptability.  *See* 334 S.E.2d at 621; *cf. Amici* Scholars' Br. 7-9 (nuisance at English common law covered making and selling harmful products).

Appellees' attempt (at 60-61) to distinguish the WVSCA's cases fails. Though "selling lumber" was not the public nuisance in *Kermit Lumber*, Appellants do not argue that merely "selling opioids" is the nuisance here.  The nuisance is the harm to public health and other resources caused by Appellees' massive opioid sales and concurrent CSA violations.  *See infra* pp. 11, 37.  As in *Kermit Lumber*, the nuisance involves a commercial activity that damages public health, safety, and

other resources.  *See also Sharon Steel*, 334 S.E.2d at 620 (public nuisance ordinance aimed at commercial activity causing "harm to human health").

Appellees similarly mischaracterize (at 61) Appellants' arguments to distinguish *Wilson v. Phoenix Powder Manufacturing Co.*, 21 S.E. 1035 (W.Va. 1895).  The nuisance there was not the product itself, but unsafe conditions arising from commercial activity involving the product.  *Compare id*. at 1036 (manufacture of powder endangered nearby towns and railroads) *with* JA6360 (opioid epidemic "decreased property values," reduced Cabell/Huntington's tax base, and left many "abandoned homes").  Appellees' unreasonable actions in distributing opioids that harmed public resources and ravaged neighborhoods and communities make this a particularly strong public nuisance case.  Likewise, Appellees' attempt (at 61 n.26) to distinguish the salvage yard and used car lot in *Mahoney v. Walter* and *Martin v. Williams* because they involved negative effects on residential areas is unavailing. Appellants proved here that residential areas were among the communities harmed by the oversupply of opioids.

> **2.      Appellees ignore West Virginia opioid cases, relying on out-of-state outlier cases and an inapplicable treatise provision**

Appellees do not meaningfully defend the district court ignoring the West Virginia MLP and the WVSCA's multiple writ denials.  Appellees' cases (at 69) say only that writ denials "generally" do not indicate the lower court's decision is correct.  *See State ex rel. Miller v. Stone*, 607 S.E.2d 485, 488 n.3 (W.Va. 2004)

8

(per curiam).  The WVSCA repeatedly allowed extensive identical litigation to proceed, when it could have barred public nuisance claims categorically.  The WVSCA let stand not mere "miscellaneous" "state trial court[]" decisions, as Appellees claim (at 58 n.23, 70), but determinations of a special panel overseeing the State's many governmental opioid cases.  A federal court in diversity should heed that course of state-court litigation, not ignore it.

Like the district court, Appellees cherry-pick out-of-state cases supporting their position.  They cite (at 62) a Rhode Island case rejecting lead-paint nuisance claims, while ignoring decisions allowing such claims.  Br. 39 n.10 (citing *California v. ConAgra Grocery Prods. Co*., 227 Cal. Rptr. 3d 499, 593, 594 (Cal. Ct. App. 2017)).  This is not sound *Erie* analysis.  Selectively citing minority authority cannot overcome the WVSCA's established parameters for a public nuisance:  an act or condition that harms public rights, conduct unreasonable in relation to the community, and adaptability to varying situations.  These parameters dictate the conclusion most courts have reached:  opioid-related harms to communities are cognizable as a public nuisance.  Br. 35-36 & nn.7-8 (collecting cases).

Appellees call (at 65) one of the few opioid cases rejecting public nuisance, *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719 (Okla. 2021), "the most persuasive," partly because it involved a full trial.  But cases accepting public

9

nuisance followed full trials too.  *See*, *e.g.*, *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, --- F. Supp. 3d ---, 2022 WL 3224463, at \*50 (N.D. Cal. Aug. 10, 2022).  *Hunter* relied on a statutory public nuisance claim that West Virginia does not have and, as Appellees admit (at 66), on Oklahoma's adoption of the Restatement (Third) of Torts:  Liability for Economic Harm (2020), which West Virginia has not adopted.  Br. 38-40.

The Restatement (Second) of Torts (1979), which Appellees concede (at 64) the WVSCA has adopted, supports Appellants' position.  Br. 39 & n.10.[1] Appellees admit (at 64) that the WVSCA "has yet to refer" to the Restatement (Third)'s treatment of public nuisance on which the district court erroneously relied.  The Restatement (Third) section they cite, § 8, is limited to private parties' public nuisance claims for "economic loss," not governmental abatement actions. Restatement (Third) § 8 cmt. a; *see* Br. 39-40.  Private parties face higher burdens in bringing public nuisance claims.  *See Rhodes*, 636 F.3d at 97-98.

Appellees' attempt to expand the section's applicability beyond its stated scope fails.  The reporter's note they cite (at 65 n.28) lists illustrative cases

---

[1] Appellees object (at 65 n.27) that Appellants cite non-opioid cases listed in "updated versions" of the Restatement (Second)'s case citations by the Reporter charged with keeping it current.  These cases, like the MLP's decisions and multiple other opioid cases citing the Restatement (Second), Br. 36 n.8, allow claims based upon the Restatement (Second)'s definition of public nuisance, demonstrating that definition's ongoing vitality.

"denying efforts to recover on a public-nuisance theory for economic harm caused by defective products," Restatement (Third) § 8 reporter's note g, but Appellants do not seek recovery for economic harm.  Nor do they allege that opioids are defective—only that Appellees caused a nuisance by violating their duties as distributors.  Thus, even if the WVSCA had adopted the relied-upon section of the Restatement (Third), it would not control this case.

### 3.    The opioid crisis devastated public resources

Even if West Virginia law limited public nuisance to conduct that interferes with public property or resources, this case illustrates such egregious interference. Br. 44-45 (describing strain on public resources including public health, law enforcement, foster care, jails, neighborhoods, and more); *accord* Order Denying Pharmacy Defs.' Mots. To Dismiss ¶ 71, *In re Opioid Litig.* (W.Va. M.L.P. Aug. 3, 2022) (Add.300) (even under district court's "reformulation" requiring interference with public property or resources, governmental opioid plaintiffs can "sufficiently allege[ ]" such interference), *writ denied*, No. 22-635 (W.Va. Sept. 8, 2022) (Add.310-311).

Appellees do not address, much less dispute, that evidence.  Instead, they mischaracterize (at 61-62) this case as concerning "personal injury from consumers' use of a product."  Appellees' misdirection fails, because the WVSCA has recognized "harm which affects the public health and safety" as the "usual[ ]"

11

focus of a public nuisance action. *Kermit Lumber*, 488 S.E.2d at 925. Nor do Appellees dispute that public health and safety are among the public resources that public nuisance law traditionally has encompassed.

Appellees (at 65-66) confuse the *activity* by which a defendant effectuates the harm (*e.g.*, generating waste, distributing dangerous drugs without safeguards, manufacturing explosives in neighborhoods) with the *effect* of the harmful activity: harm to public property, resources, health, or safety. They provide no support for artificially limiting nuisance liability based on the method by which commercial activity harms public resources.

### 4.    Appellees' policy arguments fail

Lacking support in West Virginia law for carving "products" out of public nuisance, Appellees conjure a parade of horribles (at 67 & n.30), relying solely on out-of-state authority. They argue that public nuisance law threatens everything from fast food to cell phones. But Appellants proved that the opioid epidemic is unprecedented in its devastating impact on communities. That harm emerges not just from individuals using a product in a way that may risk harming others, but from regulated entities in a closed distribution system failing to maintain effective controls against diversion of highly abused drugs. *See infra* Parts II, III. These regulatory duties do not exist in the other contexts Appellees cite—the CSA does not cover Big Macs—nor are the consequences comparable.

Appellees' argument (at 66-67) that applying public nuisance law to this public-health crisis will open the floodgates of litigation on issues best addressed through legislation proves too much. West Virginia public nuisance cases often concern important matters subject to regulation. Cases brought to safeguard a public right frequently feature a public policy dimension. Yet the WVSCA has not shied away from applying the public nuisance framework.[2] *See*, *e.g.*, *Taylor v. Culloden Pub. Serv. Dist.*, 591 S.E.2d 197, 206 (W.Va. 2003) (water pollution); *Kermit Lumber*, 488 S.E.2d at 919 (same); *Elm Grove*, 9 S.E.2d at 817 (coal mining). These WVSCA cases lay bare Appellees' aim: to restrict West Virginia nuisance law from covering the important threats to public health it traditionally has encompassed.

## II. APPELLEES UNREASONABLY INTERFERED WITH PUBLIC RIGHTS BY VIOLATING THE CSA

Appellees unreasonably interfered with public rights by violating their CSA duties while distributing massive volumes of addictive opioids to Cabell/Huntington. Instead of justifying the district court's unfounded limits on distributors' CSA duties, Appellees go further, arguing they had *no* obligation to investigate suspicious orders. The court also misapplied the CSA, looking only

---

[2] Appellees cite (at 66-67 & n.29) climate change, a global problem. But the opioid crisis is a national and state issue because of Appellees' systematic regulatory violations. As the coal and water cases show, public nuisance long has been used alongside regulatory regimes.

at Appellees' policies on paper while ignoring evidence that they did not identify or investigate suspicious orders. Appellees' attempts to rehabilitate the court's fact-finding expose its shallowness, as do their defenses of the court's erroneous reasonableness analysis.

## A.    The District Court And Appellees Misinterpret The CSA

### 1.    The court departed from settled law

Before the district court's decision, courts and DEA agreed that the CSA required distributors to (1) identify, (2) report, and (3) investigate, or else decline to ship, pharmacies' suspicious orders for controlled substances. *See* Br. 8-10; *Masters Pharm., Inc. v. DEA*, 861 F.3d 206, 212-13 (D.C. Cir. 2017) (citing DEA adjudications); *In re National Prescription Opiate Litig.*, 2019 WL 3917575, at *7 (N.D. Ohio Aug. 19, 2019) ("*MDL CSA Ruling*"). They must "exercise 'due diligence' before shipping any suspicious order," *Masters*, 861 F.3d at 221-22 (quoting *Southwood Pharms., Inc.*, 72 Fed. Reg. 36,487, 36,500 (DEA July 3, 2007))—*i.e.*, contact the pharmacy "to request an explanation" for the order's unusual characteristics and then "verif[y] that explanation," *id.* at 218-19.

The district court destroyed that consensus. It held that distributors need only ensure they are not "handing over pills to pharmacies that are essentially acting as adjuncts of the illicit market." JA6503. It limited distributors to preventing diversion of pills in their own custody and by their direct pharmacy

customers; diversion "downstream from their pharmacy customers" was not distributors' concern.  JA6510-6511.[3]  These limitations contradict longstanding precedent that a distributor must investigate *any* suspicious order it receives from a pharmacy customer, irrespective of other legitimate business the pharmacy may do.  This duty includes examining the doctors, patients, and facilities the pharmacy claims to serve.  *See* Br. 57-58; *Masters*, 861 F.3d at 218.

### 2.    Appellees' denial of the duty to investigate suspicious orders fails

Appellees altogether deny the duty to investigate or else block suspicious orders.  They argue (at 55) that DEA regulations require them only to "maintain[] the physical security of controlled substances while in the distributor's physical custody and develop[] a system to identify and report suspicious orders to DEA."[4]  These arguments lack merit.

---

[3] Appellees falsely claim (at 54) through selective quotations that Appellants mischaracterized the court's interpretation of the CSA.  *Compare* Br. 27-28 *with* Resp. 54.

[4] In December 2022, the United States alleged that ABDC violated its duty to investigate suspicious orders under the CSA in "tens of thousands of instances" since 2014 because it "cleared" suspicious orders "falsely" or without justification.  Compl. at 68-73, *United States v. AmerisourceBergen Drug Corp.*, No. 2:22-cv-05209, ECF No. 1 (E.D. Pa. Dec. 29, 2022).  There, ABDC states plainly that the CSA imposes "only two requirements":  to design a system to identify suspicious orders and to report such orders to DEA.  *Id.*, Defs.' Mot. To Dismiss at 29-30, ECF No. 27-1 (Mar. 30, 2023) ("A distributor can only face liability under the CSA for failing to report suspicious orders that it discovers.").

15

*First*, Appellees misread the governing regulations (at 14-15, 55-56): 21 C.F.R. § 1301.71(a), requiring registrants to "provide effective controls . . . against theft and diversion of controlled substances"; and § 1301.74(b), requiring distributors to "design and operate a system to disclose to the registrant suspicious orders." True, § 1301.71(a) also encompasses physical-security requirements against theft. But the duty in § 1301.71(a) "is a general obligation rather than a reference to the specific, theft-focused rules in the following subsections." Brief for United States as Amicus Curiae at 22, *In re National Prescription Opiate Litig.*, Nos. 22-3750 et al., ECF No. 73 (6th Cir. Mar. 21, 2023); *see Masters*, 861 F.3d at 221 (same). That general obligation includes the specific "duty not to ship [a suspicious] order unless due diligence reasonably dispels the suspicion." *MDL CSA Ruling*, 2019 WL 3917575, at *9. There is no "more basic requirement than not to ship a dubious order bearing indicia that the drugs could be diverted to illegal channels." *Id.*

*Second*, Appellees repeat (at 56-57) the district court's misreading of case law. JA6506-6507. *Masters* and *Southwood* establish that unusual patterns in a pharmacy's opioid ordering should trigger a distributor to investigate, including the propriety of doctors prescribing and customers consuming such unusual amounts. *See supra* p. 14. Because *Direct Sales Co. v. United States*, 319 U.S. 703 (1943), predated the CSA, that case cannot limit the CSA's scope. But *Direct Sales* emphasized that the "primary effect" of selling opiates "in unlimited quantities" is

16

"to create black markets for dope and to increase illegal demand and consumption." *Id.* at 711-12. That reality disfavors curtailing Appellees' CSA duties.

This does not mean, as Appellees erroneously suggest (at 54-55), that distributors must investigate individual patients' actions. But distributors must press pharmacy customers to explain unusual ordering patterns and "verif[y] that explanation." *Masters*, 861 F.3d at 218. *Masters* affirmed DEA's ruling that the distributor needed to examine a pharmacy's opioid supply to an in-patient facility, including "'the type of treatment'" it provided, its size, and "'whether its patients would even be treated with drugs such as oxycodone 30.'" *Id.* (quoting *Masters Pharm., Inc.*, 80 Fed. Reg. 55,418, 55,499 (DEA Sept. 15, 2015)).

As to another pharmacy, the distributor failed to scrutinize "'the practice specialties of [its] physicians and whether they would be prescribing such powerful narcotics as oxycodone 30 in the course of their medical practices.'" *Id.* (quoting 80 Fed. Reg. at 55,495). Appellees' and the court's position—that distributors' diversion-control duties end with their direct pharmacy customers—contradicts this precedent.[5]

---

[5] Appellees claim (at 29-30) Joseph Rannazzisi testified that distributors are not required to "[k]now . . . the patients to whom pharmacies dispense prescription medicines." Defense counsel asked only whether Rannazzisi recognized the phrase "know your customer's customer," without elaborating. JA2414. That short exchange hardly establishes that distributors need not scrutinize their pharmacy customers' patients.

Appellees' argument (at 46 & n.17) that the duty to investigate rests on "informal guidance" that DEA "never codified" is a red herring. DEA explained the duty in its 2007 *Southwood* adjudication, upheld in *Masters*. *See Masters*, 861 F.3d at 212-13 (citing *Southwood*, 72 Fed. Reg. at 36,500); *id.* at 219-20 (rejecting similar argument that DEA "effectively amended" rules through adjudication). DEA revocation proceedings like *Southwood* are formal adjudications with the force of law. *See* 21 C.F.R. § 1301.41; *Welch v. Chao*, 536 F.3d 269, 276 n.2 (4th Cir. 2008) ("formal adjudication" has "the effect of law"); *see also Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 96 (1995) ("[A]ll the specific applications of a rule [need not] evolve by further, more precise rules rather than by adjudication.").

## B. The District Court Misapplied The CSA

The court's erroneous CSA interpretation infects its factual findings. This Court "owe[s] no deference" to fact-findings "derived as a result of the court's misapplication of the law." *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 460 (4th Cir. 1996); *see Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 n.15 (1982) (no deference for fact-findings based "upon a mistaken impression of applicable legal principles").

The district court should have examined how each distributor detected suspicious orders and how diligently it investigated them, as in *Southwood* and *Masters*. Instead, stating a distributor need only avoid supplying illegitimate

18

adjuncts of the illicit market, the court undertook a much more limited inquiry. It recited Appellees' policies, took company employees at their word that systems functioned as described, and did not examine the actual ordering practices of Appellees' Cabell/Huntington pharmacy customers or what investigation of those orders, if any, Appellees conducted. In arguing (at 47) that "the court made detailed findings expressly rejecting" Appellants' evidence, Appellees cite only this credulous, high-level review.

"[H]owever impressive [policies] sound on paper," they must also work "in practice." *Thorpe v. Clarke*, 37 F.4th 926, 944 (4th Cir. 2022). They did not. For example, ABDC repeatedly increased thresholds for SafeScript—its top Cabell/Huntington customer until DEA raided it—even though controlled substances constituted a far higher proportion of SafeScript's business (86%) than the level that ABDC's policy considered too high to permit further threshold increases (30%). Br. 51.

Appellants proved that Appellees avoided scrutinizing high-volume Cabell/Huntington pharmacies by raising ordering thresholds and then failing to investigate the orders that even their permissive thresholds managed to flag as suspicious. Br. 46-57. Appellees argue (*e.g.*, at 42, 50) that Appellants ignore the court's fact-findings. But its fact-findings are clearly erroneous, because they are

derived under an incorrect legal standard and ignore substantial contrary evidence, including Appellees' dearth of order-specific due diligence.  Br. 60-65.

### C.     Appellees' Other Defenses Of The District Court's Findings Lack Merit

#### 1.     Appellees failed to conduct adequate due diligence

In defending its due diligence, ABDC's best example (at 50 n.19) is that a *sales representative* did not recall observing "red flags" at the pharmacies he was entrusted with retaining as ABDC customers.  The paucity of that response says it all.  ABDC cites no investigations that compliance personnel undertook of particular suspicious orders.

McKesson's response (*id.*) to evidence showing McKesson let Rite Aid police itself is no stronger.  It cites testimony that McKesson was in touch with Rite Aid "a few times a month" and relied on it to provide information.  JA2259-2261 (Oriente).  This was the whole problem:  McKesson deferred to the pharmacy instead of "verif[ying] [its] explanation[s]."  *Masters*, 861 F.3d at 218.  McKesson was not even "made privy to the specifics" of chain pharmacies' diversion-control measures.  *Huntington* ECF No. 1490-30, at 65-66, 73-74 (Walker).  Appellees are silent on Appellants' evidence about other high-volume Cabell/Huntington pharmacies, such as Drug Emporium, McCloud, CVS, and Medicine Shoppe.

Appellees had almost no records of having conducted due diligence, so their argument that they actually did the requisite diligence strains credulity.  Br. 50, 65.

Their response (at 49 n.18) is that the defendant in *Masters* had a permanent-retention policy, so the absence of records there indicated none ever existed, whereas Appellees had no permanent-retention policy, so one can assume they conducted the required due diligence but just retained no record of it. This argument makes no sense. Because Appellees long have denied any duty to investigate, it is absurd to give them the benefit of the doubt. Appellees' concession that they did not think it necessary to retain due-diligence records is damning too. It is "common sense" that distributors should retain records throughout a relationship with a pharmacy so they can review dispensing patterns. JA2415 (Rannazzisi). Common sense also dictates careful record-keeping as the volume of highly addictive opioids increased year-after-year.

There is no evidence that Appellees ever had extensive due-diligence files for Cabell/Huntington pharmacies to begin with and considerable evidence—unaddressed by Appellees—that they did not. In 2015, when DEA requested such records for McCloud and Drug Emporium, ABDC had none. Br. 50. Cardinal had records for Medicine Shoppe back to 2008, but no due-diligence files justifying its immense orders from 2012 to 2018. Br. 53, 63, 65. Because the court misinterpreted the CSA's due-diligence requirements, *see supra* pp. 14-15, this

Court should not defer to its dubious inferences about Appellees' lack of due-diligence records.[6]

### 2.    Appellees enabled egregious overprescribing

Appellees' failures to identify and investigate suspicious orders allowed them to supply pharmacies servicing Cabell/Huntington's worst opioid overprescribers—Drs. Webb and Fisher—both of whom lost their medical licenses. Br. 55-57.  The court's opinion is silent on Webb and Fisher, which Appellees do not justify.

Appellees instead respond (at 28) that "there was no evidence that the 'top 1%' of prescribers were prescribing improperly or acting inconsistent with then-prevailing medical standards," but Webb and Fisher losing their licenses is evidence that they were.  Appellees' generalization does not answer that point. Had Appellees meaningfully investigated the swelling opioid volumes ordered by their Cabell/Huntington customers as the CSA required, they might have caught on to these doctors and taken action.

Appellees enumerate (at 50-51) specific evidence they think Appellants needed to present, such as that Appellees "knew" these doctors' prescriptions were "illegitimate"—but the fundamental problem is that Appellees turned a blind eye.

---

[6] *Vulcan Materials Co. v. Massiah*, 645 F.3d 249 (4th Cir. 2011), does not mandate deference here.  *Contra* Resp. 49.  *Vulcan* is inapt; it concerned adverse inferences as sanctions for willful spoliation.

The regulations do not turn on *knowing* a prescription is illegitimate. Distributors must detect and investigate *suspicious* orders; Appellees did not.

Appellees also fixate (at 27-28, 51) on the concept of a "pill mill," a colloquialism with no legal meaning. Their duty to scrutinize pharmacies serving doctors like Webb and Fisher did not depend on those pharmacies being "pill mills." Appellees point (at 51-52) to doctors' and pharmacists' legal duties, but these complement, rather than displace, distributors' independent duties. At bottom, Appellees' failure to comply with their duties to investigate enabled two of the country's worst opioid overprescribers.

### 3.    DEA criticized, not endorsed, Appellees

The court selectively cited DEA's supposed approval of Appellees, while ignoring DEA's show-cause and immediate-suspension orders. Br. 66-67. Appellees do the same, citing (at 42) DEA's supposed "repeated approval of [their] compliance programs." It is clearly erroneous to cite DEA's supposed endorsements—laundered through company witnesses' recollections—while ignoring DEA's contrary statements in formal orders.

Appellees claim (at 52) that Appellants rely on "unproven allegations in settlement agreements," but DEA made these statements in *orders*, not settlements. The relevant settlement facts are the amounts Appellees paid and their admissions of wrongdoing, not "unproven allegations" by DEA. Br. 17-20, 66-67 (*e.g.*,

Cardinal admitting "inadequate" "due diligence efforts" in 2012). Appellees argue (at 52 n.21) these admissions were not specific to Cabell/Huntington, but neither were the supposed DEA approvals they cite. Appellees employed nationwide policies in any case. Br. 67.

Federal Rule of Evidence 408 does not bar consideration of these settlement amounts or admissions. *Contra* Resp. 52-53. At Appellees' urging, the district court emphasized the 2007 DEA-ABDC settlement lacked a "fine or financial penalty." JA6374; JA5966 (¶ 95). Rule 408 allows admitting settlements for purposes other than to "prove the truth of the matters on which compromise had been reached." *Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1413 (4th Cir. 1992) (en banc) (federal consent decree admissible to show defendant's knowledge); *see also Gibson v. Schultz*, 1990 WL 194522, at *4 (4th Cir. Dec. 10, 1990) (per curiam) (judgment noted at 919 F.2d 734 (table)) (settlement amount admissible to show car accident's severity). Given Appellees' claims that DEA endorsed their practices, Rule 408 permits considering settlement penalties and admissions as contrary evidence. It was clearly erroneous for the court to single out one agreement's lack of penalties while omitting the others' sizeable penalties.

As for Appellees' claim (at 47) that DEA viewed ABDC as the "industry standard," the United States' pending suit against ABDC alleging "tens of thousands" of CSA violations since 2014 suggests otherwise. *See supra* note 4.

#### 4.    Rejecting Rafalski was erroneous but not dispositive

Appellees mischaracterize (at 43) Appellants' evidence as dependent upon the testimony of expert James Rafalski.  Many other witnesses testified about CSA compliance:  24 company witnesses and five DEA witnesses (besides Rafalski), including DEA's Rule 30(b)(6) witness, Thomas Prevoznik.  JA6343-6356.  Even without Rafalski, an abundant record established Appellees' CSA violations.

The court made two errors in rejecting Rafalski's opinions.  *First*, it rejected Rafalski's opinions and flagging methodologies "[i]n large part" because it disagreed with him—incorrectly—about the due diligence distributors must perform on suspicious orders.  JA6410; *see* Br. 65.  *Second*, in faulting Rafalski for using methodologies not similar enough to Appellees', the court disregarded that Appellees routinely *altered* their thresholds for top Cabell/Huntington pharmacies.  Br. 61.  Appellees do not answer these points.

Appellees argue (at 44) that Rafalski's flagging methodologies were crafted for litigation and needed to relate somehow to medical standards of care.  But their purpose was to approximate how many suspicious orders Appellees should have flagged and how much due diligence they should have done under the CSA.  JA2276-2277.[7]  Rafalski's methodologies were reasonable for that purpose.

---

[7] As DEA investigator in *Masters*, Rafalski employed a comparable approach based on the company's computer program.  *See* 861 F.3d at 228.  Here, Rafalski

Even if not, that does not end the analysis of Appellees' CSA non-compliance, given the extensive non-Rafalski record.

### 5. Changing medical standards do not excuse Appellees' CSA violations

Like the district court, Appellees belabor (at 23-24) changes in the medical standard of care for pain and opioid manufacturers' role in pushing those changes to justify the enormous opioid volumes they distributed in Cabell/Huntington. This is irrelevant to the CSA inquiry. As distributors, Appellees bore an independent duty to detect and investigate orders of unusual size, frequency, or other pattern. *See City & Cnty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 683 (N.D. Cal. 2020) (rejecting same argument).

Nor are Appellees' references to the changing standard of care exculpatory. Appellees do not cite contemporaneous investigations of Cabell/Huntington pharmacies' opioid orders concluding that changing standards of care fully explained the enormous volumes. Instead, Appellees cite (at 23-27) only general policy statements by public entities and their trial examinations of Appellants' experts in 2021 to argue that changing medical standards and West Virginia demographics explain their massive opioid supply to Cabell/Huntington. This

---

offered a range of flagging methods because there were multiple Appellees and each made multiple changes to their systems over the relevant period. JA6369-6403.

post-hoc rationalization cannot justify Appellees' contemporaneous failure to investigate Cabell/Huntington pharmacies' orders.

Determining Appellees' CSA violations and public nuisance liability does not require precisely measuring opioid oversupply, as Appellees argue (at 25-27). The core of public nuisance is an "'act or condition'" that "'operates to hurt or inconvenience . . . the general public.'" *Duff*, 421 S.E.2d at 257 (quoting *Hark v. Mountain Fork Lumber Co.*, 34 S.E.2d 348, 354 (W.Va. 1945)). Such conditions are undeniable; Appellees concede (at 1) that an opioid epidemic exists in Cabell/Huntington. Appellees' but-for causal role is likewise undeniable. They shipped the overwhelming majority of opioids to Cabell/Huntington, including 89% of the oxycodone, West Virginia's deadliest drug from 2001 to 2015. Br. 14-15.[8] Thus, the only liability questions are the reasonableness of their conduct, which their CSA violations answer, and proximate causation, addressed below.

Nothing in the CSA or West Virginia public nuisance law requires a precise measurement of opioid oversupply. Appellees' only citation, *People v. Purdue Pharma L.P.*, 2021 WL 7186146 (Cal. Super. Ct. Dec. 14, 2021), is inapposite. The plaintiffs alleged false marketing by opioid manufacturers but failed to show the defendants actually made false or misleading statements. *Id.* at *13-20.

---

[8] Appellees argue (at 27) that there was no evidence they shipped more than legitimate medical needs—but the widespread death, addiction, and other social harms are patent evidence of that.

Appellees' centrality in the opioid supply chain and their CSA violations distinguish this case.

### D. The District Court Analyzed Reasonableness Erroneously

Besides its CSA errors, the court erred in analyzing the reasonableness of Appellees' conduct. It failed to consider the "reasonableness . . . in relation to the particular locality" of shipping more than 80 million dosage units of opioids into a community of only 100,000 people. *Duff*, 421 S.E.2d at 257; *see* Br. 67-68. Appellees suggest (at 39-40) that *Duff* sets out a single nuisance inquiry, but it explained separate private and public nuisance tests. *See* 421 S.E.2d at 256-62. "[R]easonableness . . . in relation to the particular locality" is the "general rule" of public nuisance in West Virginia. *Id.* at 257.

Appellees try (at 40) to excuse this failure through selective quotation, but the court referred to the "volume of prescription opioids in Cabell/Huntington" only to explain its (mistaken) view that doctors' good-faith decisions determined that volume, not to analyze whether it was reasonable for Appellees to ship 40 opioid pills per person to Cabell/Huntington annually for 20 years.

Even if simply balancing harm against utility were the entire inquiry, the court's balancing erred. Its conclusion that distributing medicine to support "legitimate" patient needs as determined by doctors acting "in good faith cannot be deemed an unreasonable interference," JA6498, amounts to the grotesque

28

suggestion that West Virginia's opioid crisis was worth it to treat some legitimate pain patients. It contradicts West Virginia law, under which even a "business lawful in itself" can be a public nuisance. *Duff*, 421 S.E.2d at 257.[9]

The district court's balancing also ignores—as do Appellees—that Appellees' distribution facilitated more than just legitimate, good-faith prescriptions. The court disregarded the testimony of DEA witnesses that egregious overprescribing by even a few doctors (like Webb and Fisher) could cause serious harm. Br. 68-70. That risk is precisely why distributors have regulatory obligations to prevent diversion and why Appellees' CSA violations render their conduct unreasonable.

## III. THE DISTRICT COURT ERRED IN HOLDING THAT APPELLANTS DID NOT ESTABLISH PROXIMATE CAUSE

The court erroneously concluded that Appellees did not proximately cause the opioid epidemic in Cabell/Huntington because they did not act culpably and because the epidemic had other causes: overprescribing, overdispensing, and diversion. But the court failed to determine that those other causes "operate[d] independently of anything else," as they must "to insulate the original tort-feasor against liability." *Evans v. Farmer*, 133 S.E.2d 710, 718 (W.Va. 1963). It further

---

[9] Appellees' footnote 14 (at 41-42) misses the point by reciting the facts of *Pope v. Edward M. Rude Carrier Corp.*, 75 S.E.2d 584 (W.Va. 1953). The district court's mistake was misreading *Pope*, eliciting a rule that conduct the public convenience "imperatively demands" cannot be a nuisance. JA6498 (quoting 75 S.E.2d at 589). The WVSCA has never held that.

29

failed to consider whether Appellees *concurrently* caused the crisis and whether those other causes were reasonably foreseeable.  Br. 75-77.

Appellees largely ignore these failings.  They advance a spurious distinction, arguing the court made distinct rulings on "oversupply" and "proximate causation." *Compare* Resp. 19-30 *with* Resp. 31-36.  But Appellees do not deny that they distributed the overwhelming majority of prescription opioids to Cabell/Huntington for more than a decade, and they acknowledge (at 8) that significant diversion occurred.  They dispute only whose culpable conduct is responsible.  Once Appellees' unreasonable conduct is established, *see supra* Part II, that dispute reduces to the single question of proximate causation on which the court erred.

Appellees characterize (at 9-10) the court's decision as turning solely on Appellees' conduct being "too remote" from the harm.  But remoteness is not an independent element.  Rather, it is coextensive with West Virginia's core causation inquiries the court failed to undertake.

### A.    Appellees Proximately Caused The Opioid Epidemic In Cabell/Huntington

Appellants proved that Appellees shipped excessive volumes of opioids to Cabell/Huntington while failing to guard against diversion and that they knew ineffective diversion controls would lead to diversion, abuse, and worse.  Br. 14-20, 46-55.  Evidence also established the link between oversupply, diversion, and the opioid epidemic.  *See* Br. 76 (citing JA1263 (Prevoznik); JA1198-1200

30

(Hartle)); JA2454 (Keyes) ("There's a causal association between the supply of prescription opioids in Cabell/Huntington and the increase in opioid-related harms.").  The only reasonable conclusion from this evidence is that Appellees proximately caused the nuisance in Cabell/Huntington.  *See* Restatement (Second) § 824 cmt. b (nuisance "liability . . . arises because one person's acts set in motion a force or chain of events resulting in the invasion"); *In re National Prescription Opiate Litig.*, 2019 WL 4178617, at *4 (N.D. Ohio Sept. 3, 2019) (causation inferable from opioid distributors' "massive increases" in opioid supply while failing to maintain diversion controls).[10]

Even if overprescribing, overdispensing, and diversion by third parties (including criminals) also caused the opioid epidemic in Cabell/Huntington, they operated *concurrently* with Appellees' failure to prevent diversion.  Even the court emphasized the interrelatedness of Appellees' conduct and the conduct of prescribers and dispensers, *see* JA6468, as do Appellees (at 21, 41).  And those causes were reasonably foreseeable to Appellees.  The Supreme Court emphasized it 80 years ago, *see Direct Sales*, 319 U.S. at 711-12; DEA told them so as early as 2005, Br. 16; Appellees' own witnesses acknowledged it, *see* Br. 76; and West

---

[10] Appellees argue (at 25 n.9) that this causal inference does not apply to them because they were not responsible for the volume of opioids shipped to Cabell/Huntington.  That implicitly concedes that, if Appellees' conduct was culpable due to CSA violations, the causal inference is operative again.

Virginia courts have so held, *see*, *e.g.*, *Brooke Cnty.*, 2018 WL 11242293, at *6.

Those other causes therefore could not break the causal chain. *See Sergent v. City of Charleston*, 549 S.E.2d 311, 320 (W.Va. 2001) (per curiam) (tortfeasor not "relieved from liability" by "intervening acts of third persons if those acts were reasonably foreseeable").

### B.   Appellees' Causation Arguments Fail

Appellees do not meaningfully defend the court's failure to consider concurrent causation or reasonable foreseeability. Like the court, they conclude that none of their conduct was "culpable" under the CSA, so they summarily dispense (at 39) with any need to consider whether they were a concurrent cause of the opioid epidemic or whether any intervening causes foreseeably resulted from their conduct. But under the CSA, properly interpreted, Appellees' conduct *was* culpable. *See supra* pp. 19-24. The district court therefore should have conducted a complete proximate-cause analysis under West Virginia law. It failed to do so, as do Appellees.

Instead, Appellees focus (at 32) on the supposedly "distinct" "remoteness element" of proximate cause. They argue (at 16-17, 34) that the court's conclusion that Appellees' conduct was "too remote" from Appellants' injuries to be a proximate cause adequately supports its causation determination. These arguments have no

32

basis in West Virginia law, mischaracterize Appellants' brief, and depend on
inapposite cases.

### 1. Appellees' "remoteness" arguments have no basis in West Virginia law

Remoteness is not a distinct element of proximate causation; it is coextensive
with its other elements. Whether a cause is "too remote" to be a proximate cause
depends on whether there are concurrent causes or intervening causes that were
foreseeable. Appellees' cases demonstrate these principles. *See*, *e.g.*, *Humphrey v.
Westchester Ltd. P'ship*, 2019 WL 2185972, at *5 (W.Va. May 21, 2019) (conduct
was too remote to be proximate cause where intervening cause was "completely
unforeseeable"); *Metro v. Smith*, 124 S.E.2d 460, 464 (W.Va. 1962) ("negligence
. . . must be a proximate, not a remote, cause of injury"); *Webb v. Sessler*, 63
S.E.2d 65, 69 (W.Va. 1950) (conduct was too remote where there was "a sole,
effective intervening cause").

Not even the district court adopted Appellees' strained interpretation of
remoteness. Appellees assert (at 36) that the court did not identify "'intervening
acts' that defeat[ed] proximate causation as a matter of law," but found only that
those other acts made Appellees' conduct "too remote" to be actionable. But that
is exactly what the court concluded: "overprescribing by doctors, dispensing by
pharmacists of the excessive prescriptions, and diversion of the drugs to illegal
usage [were] *all effective intervening causes*." JA6515 (emphasis added).

The court erred by not considering whether those supposed intervening causes were reasonably foreseeable, thereby leaving the causal chain intact. Appellees have no answer, other than to attempt to eliminate the foreseeability inquiry from the analysis.

> **2.    Appellees misstate Appellants' causation arguments and rely on inapposite cases**

Appellees erroneously assert (at 32) that Appellants fail to address "the remoteness element" of proximate cause.  Remoteness is not an isolated "element"; because overprescribing, overdispensing, and diversion were reasonably foreseeable, Appellees' conduct was not too remote.  Br. 77.  Courts, including in West Virginia, have held that distributors' conduct "was not too remote from the opioid epidemic" and that "the acts of third parties (even criminals) were foreseeable and did not create a new effective cause or operat[e] independently." *Brooke Cnty.*, 2018 WL 11242293, at *6; *see also In re National Prescription Opiate Litig.*, 2018 WL 6628898, at *5 (N.D. Ohio Dec. 19, 2018) (opioid defendants' conduct "not too remote" to be a proximate cause); Br. 77.

Appellees ignore that authority.  Instead, they rely (at 33-35) on two readily distinguishable cases.  In each, the court merely determined that the plaintiffs had failed to plead proximate causation plausibly.  In *City of Charleston v. Joint Commission*, 473 F. Supp. 3d 596 (S.D.W.Va. 2020), pain management strategies promoted by the defendant health care accreditation companies were "too attenuated"

from the opioid epidemic's harms and "influenced by too many intervening causes." *Id.* at 631. The court distinguished those companies' causal role from opioid distributors': they "had no role in manufacturing, *distributing*, or marketing opioids," making them "one substantial step further removed from the [harm]." *Id.* at 630-31 (emphasis added). If anything, *City of Charleston* supports Appellants, because Appellees *are* distributors of opioids, and voluminous evidence shows they contributed significantly to the harm.

A case by third-party payors, *Employer Teamsters-Local Nos. 175/505 Health & Welfare Trust Fund v. Bristol Myers Squibb Co.*, 969 F. Supp. 2d 463 (S.D.W.Va. 2013), involved a pleading defect and a different legal standard. The plaintiffs alleged misleading marketing by pharmaceutical companies but failed to specify "who received these misrepresentations, how the misrepresentations influenced doctors, and why certain patients received [the marketed drug] instead of alternative medications." *Id.* at 475. The court applied the proximate-cause test for RICO and consumer fraud, *id.*, not West Virginia public nuisance. *See West v. National Mines Corp.*, 285 S.E.2d 670, 678 (W.Va. 1981) ("all persons who join or participate in the creation or maintenance of a nuisance" are liable). Its holding is irrelevant here.

## IV.   THE DISTRICT COURT ERRED IN HOLDING THAT THE REQUESTED ABATEMENT REMEDY IS UNAVAILABLE

The court erred in holding that equitable abatement was unavailable to address the opioid epidemic's harms in Cabell/Huntington because abatement can eliminate only wrongful conduct, not harmful conditions.  Br. 80-84.  It miscast Appellants' requested remedy—funding measures to abate the opioid epidemic— as damages.  That a remedy requires funding does not convert it into damages. Br. 85-86.

Appellees retreat from the court's positions, conceding that abatement may address nuisance-causing conditions and involve paying money.  But they misread West Virginia law to limit the *types* of conditions abatement can address and, like the court, miscast Appellants' requested abatement remedy as damages.  These limits fail, too.

### A.   Abatement May Require A Defendant To Address Harmful Conditions It Created

Appellees concede (at 72-73), as they must, that abatement may require a defendant to remedy conditions giving rise to a nuisance.  But they argue (at 73) that abatement may address only nuisance-causing conditions that are "indistinguishable from" or "physical manifestation[s]" of defendants' wrongful conduct.  West Virginia law contains no such limitation.  Abatement may address any "condition that unlawfully operates to hurt or inconvenience . . . the general public." *Hark*, 34 S.E.2d at 354.

36

In any event, the conditions Appellants seek to abate *are* physical manifestations of the public nuisance Appellees caused. *See*, *e.g.*, JA6356-6359 (describing widespread addiction, fatal overdose, neonatal abstinence syndrome, and infectious disease); JA6360 (opioid epidemic "increased crime rates, decreased property values, and adversely affected neighborhoods throughout Cabell and Huntington"). Because each case of opioid addiction may cause community consequences for decades, Cabell/Huntington have a protracted need for abatement measures.

The decisions Appellees cite (at 73) confirm that abatement may require defendants to address harmful conditions beyond those "indistinguishable from and coextensive with" wrongful conduct. *Martin v. Williams* upheld an abatement order requiring the defendants to cease nuisance-causing conduct *and* remove nuisance-causing conditions. 93 S.E.2d 835, 836 (W.Va. 1956) (enjoining conduct, including operation of used car business, and requiring removal of nuisance-causing conditions, including "equipment, installations and structures"). Contrary to Appellees' contention (at 73), those conditions did not "concern[] the conduct of the defendant in operating the car lot" because they would continue to cause a nuisance even after the defendant's conduct at the lot ceased.

Likewise, in *Kermit Lumber*, the defendants had to remediate a hazardous "condition"—contamination of a former business site and nearby river—that

existed long after the defendants' conduct.  488 S.E.2d at 921.  The nuisance-

causing condition was not "coextensive" with the defendants' conduct, Resp. 73,

because it continued to endanger public health for years after the defendants

vacated the business site.  *Kermit Lumber* emphasized the distinction between the

conduct and the ongoing condition:  "[i]t is inconceivable that the arsenic caused

all the damage it could prior to 1988 when the appellees vacated the business site."

488 S.E.2d at 925.

Appellees argue (at 73-75) that the remedies in *Kermit Lumber* and *Martin*

did not extend to remediating harms like "illness or disease from drinking arsenic-

polluted water" and "depreciated property values."  But the courts in those cases

had no reason to require the defendants to abate those harms because the plaintiffs

never requested that remedy.  Nothing in *Kermit Lumber* suggests that illness had

emerged as a component of the nuisance.

Appellees repeatedly mischaracterize (at 3-4, 71, 73-75) the requested

abatement remedy as seeking recovery for "personal injuries."  Appellants do not

seek payment for individual Cabell/Huntington residents' personal injuries.  They

seek a forward-looking remedy to eliminate ongoing dangerous conditions—a

widespread public-health crisis and its attendant harms—that Appellees created.

Finally, Appellees rely (at 75) on *West*, in which the defendants had to abate

a nuisance-causing condition by removing excessive dust from a road that caused

harm by spoiling food and inhibiting residents' breathing.  285 S.E.2d at 673, 679.

Unlike in this case, the remedy of removing the dust would eliminate all harms the

dust caused.  *Id.* at 679.  Likewise, in *Burch v. Nedpower Mount Storm, LLC*, the

court did not need to abate any conditions because the nuisance concerned only

the defendants' *conduct* in operating wind turbines.  647 S.E.2d 879, 891 (W.Va.

2007).  By contrast, the harm Appellees caused is far more widespread and

entrenched.  Abating it will require more than just instituting changes to Appellees'

distribution practices or removing prescription opioids completely from

Cabell/Huntington.

### B.     Payment Of Money Does Not Convert Abatement Into Damages

The court erred in labeling Appellants' requested remedy as damages or

"remuneration for the costs of treating the horrendous downstream harms of

opioid use and abuse," because Appellants seek funding for proposed abatement

measures.  JA6518.

Appellees now concede (at 77) that an abatement remedy can include

payment of money but persist in arguing (at 70-71, 78) that Appellants seek

damages.  The requested abatement relief would not compensate Appellants for

past or future injuries.  Rather, it would pay for programs necessary to abate the

epidemic of opioid use disorder created by Appellants' conduct.  Abatement

"may entail the payment of money by a defendant" to eliminate a nuisance-

causing condition without converting the remedy into damages. *State ex rel. AmerisourceBergen Drug Corp. v. Moats*, 859 S.E.2d 374, 384 (W.Va. 2021); *see also Witteried v. City of Charles Town*, 2018 WL 2175820, at *3 (W.Va. May 11, 2018) (upholding abatement order that required defendants to pay costs of demolishing building).

Appellees fail to explain away the conflict between the court's conclusion and the contrary holdings in *Moats* and the MDL. It is true but immaterial that, as Appellees note (at 76-77 & n.35, quoting the *Moats* concurrence), these pleading-stage rulings left "the scope of potential remedies . . . for future resolution." The district court's abatement holding rests on *legal* errors: (1) that abatement can remedy only wrongful conduct, not conditions; and (2) that Appellants requested damages, not equitable abatement. Both the MDL and the MLP rulings conflict with those rulings as a matter of law.

## C.    Appellees' Remaining Arguments Fail

Because the court's abatement ruling rested on legal error, Appellees' objection (at 75-76) to specific measures in Appellants' proposed abatement plan is premature. Reversal of the court's judgment necessarily will require remand on the scope of that remedy. Regardless, Appellants properly seek treatment for people addicted to opioids and programs to address other harms of the opioid

epidemic. These measures are reasonably necessary to address the problems Appellees caused.

Finally, Appellees rely (at 78) on cases involving private parties to argue that federal common law bars equitable relief. *See*, *e.g.*, *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 839 (9th Cir. 2020) (denying injunctive relief to private, not public, plaintiff); *SSMC, Inc., N.V. v. Steffen*, 102 F.3d 704, 708 (4th Cir. 1996) (same); *Guaranty Trust Co. v. York*, 326 U.S. 99, 105-06 (1945) (same). Different standards apply to cases brought by public entities, which need not show that they lack "'an adequate remedy at law'" to obtain equitable relief, especially "where the activity may endanger the public health." *Environmental Def. Fund, Inc. v. Lamphier*, 714 F.2d 331, 337-38 (4th Cir. 1983) (quoting *Shafer v. United States*, 229 F.2d 124, 128 (4th Cir. 1956)). Appellants need only show that equitable relief is "in the public interest." *Id.* at 338 (quoting *Shafer*, 229 F.2d at 128). At trial, Appellants proved just that.

## CONCLUSION

The district court's judgment should be reversed.

Respectfully submitted,

/s/ *David C. Frederick*

Louis M. Bograd
Michael J. Quirk
MOTLEY RICE LLC
401 Ninth Street, N.W., Suite 1001
Washington, D.C. 20004
(202) 386-9623
lbograd@motleyrice.com
mquirk@motleyrice.com
*Counsel for Plaintiff-Appellant*
*City of Huntington, West Virginia*

Anthony J. Majestro
Christina L. Smith
POWELL & MAJESTRO, PLLC
405 Capitol Street, Suite P-1200
Charleston, West Virginia 25331
(304) 346-2889
amajestro@powellmajestro.com
csmith@powellmajestro.com
*Counsel for Plaintiff-Appellant*
*Cabell County Commission*

May 1, 2023

David C. Frederick
Ariela M. Migdal
Lillian V. Smith
Matthew N. Drecun
Kathleen W. Hickey*
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dfrederick@kellogghansen.com
amigdal@kellogghansen.com
lsmith@kellogghansen.com
mdrecun@kellogghansen.com
khickey@kellogghansen.com
* Admitted only in Massachusetts;
supervised by members of the firm
*Counsel for Plaintiffs-Appellants*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No.** __22-1819(L)__    **Caption:** __City of Huntington v. AmerisourceBergen Drug. Corp.__

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

---

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

---

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

---

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

---

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✔] this brief or other document contains __see Attach.__ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✔] this brief or other document has been prepared in a proportionally spaced typeface using __Microsoft Office Word 2016__ [*identify word processing program*] in __Times New Roman 14__ [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) __David C. Frederick__

Party Name __City of Huntington & Cabell Cnty. C__

Dated: __May 1, 2023__

**ATTACHMENT TO**
**CERTIFICATE OF COMPLIANCE**

1.      The foregoing Reply Brief for Appellants complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) and with the Order of this Court dated March 1, 2023, which granted Appellants leave to file a reply brief not in excess of 9,000 words, because this Brief contains 8,983 words, excluding the parts of the Brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      The foregoing Reply Brief for Appellants complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this Brief has been prepared in proportionally spaced typeface using Microsoft Office Word 2016 in 14 point Times New Roman.


Dated:  May 1, 2023              By:        /s/ *David C. Frederick*
                                                        David C. Frederick

## CERTIFICATE OF SERVICE

I hereby certify that, on May 1, 2023, I electronically filed the foregoing

Reply Brief for Appellants with the Clerk of the Court for the United States Court

of Appeals for the Fourth Circuit using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by

the appellate CM/ECF system.

/s/ *David C. Frederick*
David C. Frederick